**HARMON et al. v. SCHMITZ et al.**
No. 1867.

Court of Civil Appeals of Texas. Beaumont.
Feb. 27, 1930.

Rehearing Denied March 5, 1930.

Stevens & Stevens, of Houston, for plaintiffs in error.

E. B. Pickett, Jr., of Liberty, for defendants in error.

WALKER, J.

The parties will be referred to as appellants and appellees. This suit was instituted by appellee Mrs. J. F. Schmitz, joined pro forma by her husband, in her capacity as natural and legal guardian of her minor daughter Meriam Cannon, against appellants, Mrs. R. D. Harmon and her husband and other parties not necessary to name. Mrs. Harmon was sued personally and as temporary administratrix of the estate of W. A. Cannon, deceased. The purpose of the suit was to recover the proceeds of a draft for $2,000, dated February 2, 1927, drawn by the First National Bank of Houston upon the National City Bank of New York, payable to William A. Cannon, and indorsed by him to the order of his sister, Mrs. Harmon, and also to recover the title and possession of two stock certificates, one for three and the other for thirty-six shares of the common stock of the Standard Oil Company of New Jersey. Appellees claimed title to this property for Meriam on the ground that she was the only heir at law of W. A. Cannon, deceased. The Harmons answered by general denial and specially that they had title to the property by virtue of a gift from W. A. Cannon to Mrs. Harmon, and further, if they did not hold it as a gift, then the transfer was made to Mrs. Harmon by her brother in fraud of his creditors, and that the agreement on the part of Mrs. Harmon, if any was made, to hold the property in trust and to reconvey it to W. A. Cannon was unenforceable. The trial was to a jury, and, on conclusion of the evidence, verdict was instructed in favor of appellees.

The material facts are as follows:

Mrs. Schmitz married W. A. Cannon when she was about fifteen years old and lived with him as his wife for about two years, when they were divorced. Meriam was born to them during the marriage, and was about one year old at the time of the divorce. After the separation, she continuously lived with her mother. W. A. Cannon left the United States and worked in many parts of the world, principally, it appears from the testimony, in Rumania, where he worked for the Standard Oil Company and accumulated the estate in controversy. He returned to the United States about 1926, just after Meriam's thirteenth birthday. While he was away from the United States, he kept in touch with his daughter, and manifested his love for her in his correspondence with his friends. When he returned home, he visited his daughter, and she frequently visited him, and under all the evidence they were mutually fond of each other. Mr. Cannon had his money deposited in the First National Bank of Houston.

Mr. C. C. Hall, an assistant cashier of this bank, testified that on February 2, 1927, Mr. Cannon called at his bank and told him that he had entered into a partnership with some one, but gave no name, and that "this partner, after they had gotten into a transaction or two, had proven he did not have any money, and Cannon was afraid he was not going to be able to carry the leases through himself and was afraid he might be attached in his bank account, or his property might be attached to fulfill these contracts. He asked me if there was not any way in which he could protect his property, and I stated to him that I had known of cases where it had been done, where property had been transferred to the name of a wife, or a mother, or father, or some relative that could be trusted; and so he asked me if I would show him what to do with his stock certificates—he had some shares of Standard Oil, I do not remember how many or anything about it—but I filled out a blank power of attorney for him, made it out to his sister. You understand this power of attorney was not made on the stock certificates, but on a blank power of attorney.

"I suggested that he put his property in some one else's name until he straightened out his affairs. I suggested to him to buy a New York draft for his bank balance. I think he did that, for part of it. I told him to put this check in some safe place. I suggested that he have it made out to some relative and either turn it over to them or put it in a safe place. I do not recall that I recommended any kind of a safe place. He bought a New York draft. That draft was payable to Mrs. Harmon, I think. I am not sure. I do not know whether it was endorsed over to Mrs. Harmon. I did not see that at all. I did not advise that he put this property in the name of some relative. I merely suggested that it had been done. I suggested that it could be done, and he adopted my suggestion.

"He drew from his personal account the money with which to purchase this New York Exchange or draft that I speak of. He drew a check on his personal account. He had this oil stock that I speak of in the safe deposit box, I believe. I do not know that. I am not sure about that. After he drew this money and bought this New York exchange for two thousand dollars the check or draft that he had purchased was put in a safe deposit box. Mr. Cannon had a box in his own name, and

had that box transferred to the name of Mrs. Pinkie Harmon. The records there at the bank show that Mr. Cannon rented a box for his sister and took the cards out to her, which she signed, and they were delivered back to the bank. I do not know who by; maybe by her, and maybe by him. We do not have any record of that. All we know is that they were brought back properly signed. Mrs. Harmon was not present at the time of this transaction. I do not know whether the keys to that safety deposit box were ever delivered to her. I know she surrendered one of them. She signed a release surrendering the key, and that is all I know. That was on March 7, 1927.

"At the time Mr. Cannon came in there to see me about this matter, he had $2,560.27 on deposit in his account. Two thousand dollars of that was put in the form of a New York draft in favor of Mrs. Harmon, or whatever it may show. He bought travelers checks with the balance of five hundred and sixty dollars, several traveler's checks. No suit, within my knowledge, has ever been filed against Mr. Cannon by any one involving the attachment or garnishment of any account that he might have had at the First National Bank. He did not say anything to me at that time regarding any desire to give Mrs. Harmon, his sister, any property. He indicated to me that his purpose in putting that property in her name was to avoid any litigation he might get into by reason of this oil lease business he had got into, that he stated he had got into. He stated to me that he had gotten into an oil lease proposition and was afraid he might get sued, and he wanted to put it beyond the reach of any law suit, or any creditor.

"At the time Mr. Cannon and I were discussing the disposition of the account he had on deposit, after he decided to switch his money into this draft, he did not say anything with reference to how long he intended to keep his money in that form. He did not say anything with reference to wanting to keep his money safe until he was through with this proposition as to these leases. I think I suggested that to him, that he leave his money in that form until all this blew over, until he settled his matters amicably. He did not say anything with reference to that. It was after I made that remark that he did change his account and buy the draft."

On the same date, February 2, 1927, that Cannon rented this safety box in the name of Mrs. Harmon, she, by written appointment, made Cannon her deputy, with full authority to open said box and remove the contents therefrom, and to otherwise absolutely control the same. On the 16th of February following, while suffering under an insane delusion that he was being followed by a mob, and was in danger of his life, Cannon committed suicide by drowning himself in a small

creek. Meriam was his sole heir. His sister, Mrs. Harmon, was appointed temporary administratrix of the estate, and under that appointment the property in controversy was delivered to her, which she claimed, not only in her capacity as temporary administratrix, but also asserted personal ownership thereto. She cashed the draft, and from the proceeds paid $103 on the funeral expenses. The balance of these expenses was paid from other funds belonging to the deceased that had been delivered to Meriam and are not involved in this controversy. Some of Cannon's friends, with whom he had discussed his business, were witnesses upon the trial, and testified that he claimed to own the New York draft and the oil stock. No witness testified that he ever said he had given this stock and draft to Mrs. Harmon.

The strongest testimony in appellants' favor was by Judge Isaacs, a justice of the peace, and one of Cannon's closest friends. He testified: "That he was well acquainted with Cannon, and was with him nearly every day for sometime before his death. That he appeared at all times to be normal and natural. That his sister, Mrs. Harmon, had a key to the safety deposit box."

Judge Alfred Isaacs further testified: "He told me prior to his death that he had some money, and that he had it in the bank in Houston. He did not tell me what bank, but he had it in his sister's name. He said it was in his sister's name, and that he was here and yonder, and liable to be engaged off when he died, and he wanted her to have his money; that he did not want his former wife to have any of it."

There was no evidence that Cannon had incurred any liability in purchasing oil leases, or that he had a partnership with any one for the purpose of purchasing oil leases, or that he had incurred any liability in any other transaction. There was no evidence of any creditor or creditors at the time of the transaction between him and Mrs. Harmon, nor was there any evidence of any circumstance from which debts arose in the future. On this issue the evidence went no further than to show that Cannon was trying to buy certain oil leases upon condition that he be furnished with a good title and that the title offered him was turned down. We believe the statement, as made, reveals all the circumstances relied upon by appellants to sustain their theory of gift, and that the transfer was made to them in fraud of creditors.

## Opinion.

It conclusively appears, from the undisputed facts, that Cannon did not intend to give his sister the property in controversy. To constitute a gift "it is essential * * * that there be a donative intent." 28 C. J. 633. This authority, same volume, page 634, says: "A mere intention to make a gift, how-

ever clearly expressed, which has not been carried into effect, amounts to nothing."

■ These propositions are well illustrated by the principal cases cited and relied upon by appellants. Brown v. Fore (Tex. Com. App.) 12 S.W.(2d) 114, 63 A. L. R. 435; Lord v. Insurance Co., 95 Tex. 221, 66 S. W. 290, 56 L. R. A. 596, 93 Am. St. Rep. 827; Richardson v. Hutchins, 68 Tex. 87, 3 S. W. 276. In each of these cases the evidence in support of the gift raised the issues of donative intent and that this intent had been carried into effect, with the resulting consequence that the absolute title to the property in controversy passed to the donee. In this case there was no evidence of an intent on the part of Cannon to give his sister this property. Everything he did, everything he said, manifested a fixed purpose to retain in himsel its beneficial use and to claim it as his own. No testimony offered manifested this intention more clearly than the quoted testimony of Judge Isaacs, which appellants cite in support of their proposition. Cannon told this witness "that he had some money;" "had it in the bank in Houston;" "had it in his sister's name;" "it was in his sister's name;" "the box was rented in her name." This testimony could only mean that Cannon did not think that he had parted with the beneficial use of his property. That he may have said to Judge Isaacs, in speaking of his sister, "when he died * * * he wanted her to have his money," did not raise the issue of a gift, but merely of an intention to make a gift at some future date. That is not sufficient. Quoting again from 28 C. J. 629: "The intention must be executed by a complete and unconditional delivery."

While appellants have insisted that the property was a gift to them, their principal contention is based upon their second proposition, which is as follows: "Where a deed, assignment or transfer is executed with the intention of protecting the property of the assignor against future creditors, although at the time of the execution of the instrument no creditors actually existed, such deed can only be set aside at the suit of creditors, but as between the assignor and the assignee the conveyance or assignment will remain undisturbed and no trust will be created in favor of the grantor or assignor, and in such a case the heirs or legal representatives of the grantor or assignor are bound by the act of the grantor or assignor."

This is not a sound legal proposition. In support of their contention appellants have cited Quarles v. Hardin (Tex. Civ. App.) 197 S. W. 1112, 1115. In that case Quarles, with the purpose of defrauding future creditors, deeded the community estate to his wife, as her separate property. This deed was attacked by the subsequent creditors of Quarles. The Court of Civil Appeals sustained this attack, saying: "We therefore hold that in view of the fraudulent purpose with which John Quarles executed the deed to his wife, existing at the date of its execution, the same was invalid as to subsequent creditors, and their rights were not impaired by the fact that the deed was immediately registered in the county where the land lay."

A writ of error was granted against that holding, and in Quarles v. Hardin, 249 S. W. 459, 462, the judgment of the Court of Civil Appeals was reversed, the Commission of Appeals saying: "Whatever may have been in the mind and heart of Quarles or his wife when the deed under consideration was executed, the act of filing it for record rendered impossible the perpetration of any fraud by virtue of it." And: "Even if Quarles had the secret purpose of placing his property beyond the reach of those to whom he might in the future become indebted, that intention alone did not make the deed invalid, nor was it an act of fraud. The law does not deal with mere determinations of the will. Neither do mere determinations of the will affect anybody or have any results. It is only determinations of the will which produce an effect upon the world of sense, or outward acts, of which the law takes any cognizance."

We think the facts of this case bring it clearly within the rule announced by the Supreme Court in Rivera v. White, 94 Tex. 538, 63 S. W. 125, where the Supreme Court recognized that "it is well settled in this court that deeds made in fraud of creditors pass title as between the parties to them, and that agreements on the part of grantees to hold in trust and to reconvey will not be enforced."

In that case the issue was simply whether or not the mere motive which impelled the party to make the deed precluded him from enforcing the trust upon which it was executed. The plaintiff in error had conveyed his land to his sister under an agreement that she would hold it in trust for him for the purpose of avoiding a claim for alimony which he feared his wife, who had sued him for a divorce in Illinois, would make against him. The claim was never made. Mrs. White died without having reconveyed the land, leaving her husband and some minor children surviving her. Plaintiff in error brought the suit against the minor children to recover the property. Discussing the law of these facts, Judge Williams, speaking for the Supreme Court, said: "The statute of frauds, for the protection of creditors, makes void all conveyances of property made by their debtors with intent to defraud them, and, in order to carry out its policy, and deter debtors from such attempts to put their property beyond the reach of creditors, and at the same time secure to themselves the enjoyment of it by secret arrangements with those to whom it is

apparently conveyed, the statute makes such conveyances valid and binding between the parties; and courts, in furtherance of this policy, refuse to give any relief against such conveyances and to enforce any agreements or trusts growing out of them. But the statute applies only to conveyances made by debtors, and it is therefore only to these that such consequences should attach. The statute does not prohibit conveyances by persons who are not indebted, and no policy of the law is thwarted by a mere motive which cannot work injury to creditors. Ellis v. Valentine, 65 Tex. 547. The motive with which such a conveyance is made and the fears by which it is prompted are of no importance unless there are creditors to be protected by the statute. When the statute does not apply to the case, there is nothing to prevent the court from enforcing the rights of the parties as they are fixed by their agreements. That a conveyance upon a trust, such as that shown by the evidence constitutes the cestui que trust the equitable owner of the property, is not to be disputed, unless the motive with which the deed is made vitiates the trust; and we think the law has no concern with the futile intent to protect the property from a claim which its owner fears may be asserted against him, but which is never asserted, and does not exist."

Appellants have other propositions against the admission of certain evidence, which become immaterial in view of what has been said. Appellees were entitled to the instructed verdict.

The judgment of the trial court is in all things affirmed.