**HARMON et al. v. SCHMITZ et al.**

No. 1274—5727.

Commission of Appeals of Texas, Section B.

June 10, 1931.

Stevens & Stevens, E. A. Tully, Jr., and P. S. Matthews, all of Houston, for plaintiffs in error.

E. B. Pickett, Jr., of Liberty, for defendants in error.

LEDDY, J.

At the close of the evidence in this case, the trial court peremptorily instructed the jury to return a verdict in favor of the defendants in error. The correctness of this action is dependent upon a proper answer to the question: Did the evidence adduced. present a question for the determination of the jury as to whether Arthur Cannon in his lifetime made a valid parol gift of the property in controversy to his sister, Mrs. R. D. Harmon, one of the plaintiffs in error?

Some seventeen years ago Cannon married. He lived with his wife, the defendant in error, who is now Mrs. J. F. Schmitz, about two years, and was then divorced. One child was born of this union, Meriam Cannon, a girl, now about fifteen years of age. Cannon was an oil well driller. After his divorce he spent several years following his occupation in the foreign oil fields. During this time he accumulated the property involved in this suit. Upon his return to this country he deposited his money, about $2,500 in cash, as well as 39 shares of stock in the Standard Oil Company of New Jersey, in the First National Bank at Houston. In the early part of February, 1927, he went to Mr. Hall, assistant cashier of this bank, and stated that he had entered into a partnership agreement with some one to buy oil leases, and was afraid his partner was not going to carry his part, and that his bank account might therefore be attached. He sought information from Hall as to how this contingent liability might be avoided. The advice given by this bank official and Cannon's subsequent action thereon is shown by the testimony of defendants in error's witness, Hall, who testified as follows:

"He asked me if there was not any way in which he could protect his property, and I stated to him that I had known of cases where it had been done, where property had been transferred to the name of a wife, or a mother, or father, or some relative that could be trusted; and so he asked me if I would show him what to do with his stock certificates—he had some shares of Standard Oil, I do not remember how many or anything about it—but I filled out a blank power of attorney for him, made it out to his sister. You understand this power of attorney was not made on the stock certificates, but on a blank power of attorney.

"I suggested that he put his property in some one else's name until he straightened out his affairs. I suggested to him to buy a New York draft for his bank balance. I think he did that, for part of it. I told him to put this check in some safe place. I suggested that he have it made out to some relative and either turn it over to them, or put it in a safe place. I do not recall that I recommended any kind of a safe place.

"He bought a New York draft. That draft was payable to Mrs. Harmon, I think. I am not sure. I do not know whether it was endorsed over to Mrs. Harmon. I did not see that at all.

"I did not advise that he put this property in the name of some relative. I merely suggested that it had been done. I suggested

that it could be done, and he adopted my suggestion.

\*   \*   \*   \*   \*   \*

"He drew from his personal account the money with which to purchase this New York Exchange or draft that I speak of. He drew a check on his personal account.

"He had this oil stock that I speak of in the safe deposit box, I believe. I do not know that. I am not sure about that. After he drew this money and bought this New York exchange for two thousand dollars the check or draft that he had purchased was put in a safe deposit box. The safety deposit box was in his sister's name. He was renting a box at that time. The box was rented at the time. The box had not been rented for some time. It was rented at the time; that is, he rented it in order to put that in it. Mr. Cannon had a box in his own name, and had that box transferred to the name of Mrs. Pinkie Harmon.

"The records there at the bank show that Mr. Cannon rented a box for his sister and took the cards out to her, which she signed, and they were delivered back to the bank. I do not know who by; maybe by her, and maybe by him. We do not have any record of that. All we know is that they were brought back properly signed. The bank has possession of those cards that were signed."

\*   \*   \*   \*   \*   \*

"He didn't say anything to me at that time regarding any desire to give Mrs. Harmon, his sister, any property. He indicated to me that his purpose in putting that property in her name was to avoid any litigation he might get into by reason of this oil lease business he had gotten into—that he stated he had gotten into. \* \* \* he stated to me that he had gotten into an oil lease proposition and was afraid he might get sued, and he wanted to put it beyond the reach of any law suit, or any creditor."

It is shown that Cannon followed strictly the advice given him by this bank official. He rented a safety deposit box in the name of his sister, Mrs. Harmon, purchased New York exchange in the sum of $2,000, and indorsed the same to said sister. The 39 shares of Standard Oil stock were assigned by a written assignment, which was pinned to the stock, and all of these documents were placed in the safety deposit box. There were two keys to the box; one was given to Mrs. Harmon and the other retained by Cannon, it being found on his person after his death, some thirty days later. It was also shown that under Cannon's indorsement of the New York exchange appears an indorsement in blank by Mrs. Harmon. As a part of the same transaction, Mrs. Harmon executed what is designated as a power of deputy to William A. Cannon, which reads as follows:

"I hereby authorize the First National Bank, Safe Deposit Department, to permit William A. Cannon to have access to Box No. 77 in the Safe Deposit Department of said Bank until written notice to the contrary is given to said Bank. Full power and authority is hereby given and granted unto the said William A. Cannon to do and perform all and every act or thing whatsoever in and about the premises with reference to both withdrawing or changing from time to time the contents of said Box or in relation to any other thing pertaining thereto, including the removal of said contents, as fully to all intents and purposes as the undersigned might or could do if personally present, hereby ratifying and confirming all that the said William A. Cannon shall do or cause to be done by virtue hereof."

We think it clear that the evidence offered by defendants in error does not raise the issue that William A. Cannon intended to make a present gift of this property to his sister, Mrs. R. D. Harmon. It shows conclusively that the transfer and assignment of the draft and stock was made by Cannon in pursuance of the advice given him by Hall, the officer of the bank, for the purpose of putting this property in his sister's name so as to avoid any contingent liability that might arise by reason of the oil lease transaction in which he expected to become involved.

We will next consider whether the plaintiffs in error offered sufficient proof to raise the issue that Cannon intended to and did make a present gift of this property to Mrs. Harmon. The evidence relied upon by defendants in error to raise this issue is certain declarations made by Cannon to Judge Isaacs and Dr. Hubert. With reference to these declarations, the former testified: "He (Cannon) told me prior to his death that he had some money, and that he had it in the bank in Houston. He did not tell me what bank, but he had it in his sister's name. He said it was in his sister's name, and that the box was rented in her name, and that he was here and yonder, and liable to be engaged off when he died, and he wanted her to have his money; that he did not want his former wife to have any of it."

Dr. Hubert gave the following testimony in regard to Cannon's declarations: "He told me he had his property put in Mrs. Harmon's name. He said his money and the stuff he had put in her name so if these fellows sued him or did anything they could not get his money; if they sued him about the lease business."

Does all of the evidence, when considered most favorably to plaintiffs in error, present a jury question on the issue as to whether Cannon made a present gift of the property in question to his sister, Mrs. Harmon? We think the evidence when thus considered so conclusively shows there was no intention on the part of Cannon to vest a present interest in this property in his sister that it was the

duty of the trial court to direct a verdict for defendants in error.

In order to prevent property left by deceased persons from being fraudulently appropriated under claims of parol gifts, the law has established certain safeguards in regard to the enforcement of such gifts. Before the gift can be sustained, it must appear that all of the elements required to constitute the same be clearly established. The essential elements of this character of gift are well defined by Judge Sanborn in Allen-West Commission v. Grumbles (C. C. A.) 129 F. 287, 290, in this language: "Among the indispensable conditions of a valid gift are the intention of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject of the gift in praesenti at the very time he undertakes to make the gift; * * * the irrevocable transfer of the present title, dominion, and control of the thing given to the donee, so that the donor can exercise no further act of dominion or control over it."

In Ruling Case Law, vol. 12, p. 832, § 10, the author, in defining the requisites of a gift of this nature, says: "To make a valid, effective gift inter vivos there must be an intention to transfer title to the property as well as a delivery by the donor and an acceptance by the donee. Mere intention to give without delivery is unavailing, and delivery is insufficient unless made with an intention to give. * * * There must be an intention on the part of the donor to relinquish the right of dominion on the one hand and to create it on the other, and the delivery must be not only of possession, but also of the dominion and control of the property."

In Cyc., volume 20, p. 1223, the rule is thus announced: "As a general rule, to establish a gift inter vivos there must be a preponderance of clear, explicit, and convincing evidence in support of every element needed to constitute a valid gift. It is necessary to establish by this kind of evidence competency of donor, delivery, acceptance, and the parting by the owner with his control or right of dominion over the subject of the gift. This rule is especially applicable where the gift is not asserted until after the donor's death and where a confidential relation existed between the parties. * * * "

Again, the same author, volume 20, p. 1193, says:

"To constitute a valid gift inter vivos the purpose of the donor to make the gift must be clearly and satisfactorily established and the gift must be complete by actual, constructive, or symbolic delivery without power of revocation."

When the evidence contained in this record is tested by the application of these well-settled legal principles, it falls short of raising the issue as to a completed gift by Cannon to his sister. Nowhere in the testimony do we find any declaration by Cannon which is fairly susceptible of the construction that it was his intention to relinquish his dominion and control over this property and to vest immediate title to same in his sister.

The evidence offered by plaintiffs in error not only does not contradict the evidence of defendants in error as to Cannon's purpose in transferring this property to his sister, but it is strongly corroborative of such intention. He stated to Judge Isaacs, after he had transferred the property to his sister, that he had some money, and he had it in the bank at Houston, but it was in his sister's name. This was a direct and positive claim of ownership by Cannon made after the alleged parol gift had been completed, and is utterly inconsistent with the view that by the transfers executed by him he intended to part with his dominion and control of this property and vest absolutely and unconditionally the title to same in another. His declaration to this witness that he "was here and yonder and liable to be engaged off when he died and he wanted her (Mrs. Harmon) to have his money, that he did not want his former wife to have any of it," does not, when considered in connection with his entire statement, indicate anything further than a mere desire for his sister to have this property at his death. This testimony falls far short of showing, or tending to show, an intention to make a present gift of the property. "A mere intention to make a gift," says the author of Corpus Juris, volume 29, p. 629, "however clearly expressed, which has not been carried into effect, amounts to nothing, and enforces no rights in the subject matter of the proposed gift upon the intended donee. The intention must be affected by a complete and unconditional delivery."

The testimony of Dr. Hubert is also corroborative of the view that Cannon had merely placed his property in his sister's name for the purpose of avoiding liability from future creditors, as the witness testified that Cannon told him he (Cannon) had his property in Mrs. Harmon's name. "He said he had his money and the stuff he had put in her name so if these fellows sued him or did anything they could not get his money." This testimony strongly negatives an intention on the part of Cannon that this property should belong to his sister from the date of its transfer, for, if such had been the intention, then it was not his money, and he did not in fact have his money in his sister's name.

Again, when we consider the evidence as a whole, it conclusively shows that Cannon did not intend to part with dominion and control over this property. It will be noted that, while he indorsed the exchange or draft to Mrs. Harmon, she immediately indorsed it in blank. The transfer made of the oil stock was not executed on the usual form printed

on the certificate, but by a separate assignment which was attached to the stock. The property was therefore left in condition where the check could be cashed by Cannon, because it was properly indorsed by Mrs. Harmon, and the stock could be detached from the assignment, and disposed of by executing the printed transfer on the back thereof. That it was intended for Cannon to retain control of this property is manifest from these facts and the further fact that as a part of the same transaction in which Cannon put this property in Mrs. Harmon's name he caused her to execute what is termed a deputy power, the terms of which we have heretofore quoted. This instrument authorized him to remove this property from the safety deposit box at any time he saw fit and to substitute any other property therefor, and he retained a key to the safety deposit box which enabled him to continue to exercise dominion and control over the property. The control thus permitted was inconsistent with a completed gift of the property to his sister, but the same was in complete harmony with the plan outlined by the bank official to place this property in Mrs. Harmon's name in order to avoid it being reached by Cannon's creditors.

It is argued that the execution and delivery by Cannon to his sister of the transfers of the draft and oil stock is of itself some evidence of a gift of the property to her. This would be true if the record contained no explanation of the circumstances under which they were executed and delivered. But such is not the case. It affirmatively appears that Cannon did not intend these instruments should have the effect which their language implies.

Finally, it is insisted that, if the transfer of this property was made by Cannon to his sister with the fraudulent motive of defrauding his creditors, the law precludes his heir from enforcing the trust upon which it was executed.

The fact that Cannon transferred his property to his sister with the motive of putting it beyond the reach of those whom he feared might become creditors did not operate to prevent a trust being declared in the property, if the anticipated indebtedness never in fact arose. Under such circumstances, his motive to defraud becomes unimportant, as there was no one to be defrauded. That such a motive is not sufficient to defeat the enforcement of a trust was distinctly declared by our Supreme Court in Rivera v. White, 94 Tex. 540, 63 S. W. 125, 126. In discussing this question, Judge Williams, speaking for the court, said: "That a conveyance upon a trust, such as that shown by the evidence, constitutes the cestui que trust the equitable owner of the property, is not to be disputed, unless the motive with which the deed is made vitiates the trust; and we think the law has no concern with the futile intent to protect the property from a claim which its owner fears may be asserted against him, but which is never asserted, and does not exist."

The evidence affirmatively discloses that the liability which Cannon feared might involve his property never in fact arose. He was negotiating for an oil lease, and it was this transaction which he was fearful might involve him in some liability which would cause his property to be attached. The lease, however, was never consummated, and no liability arose against him by reason thereof.

We therefore recommend that the judgment of the Court of Civil Appeals, 26 S.W.(2d) 289, affirming the judgment of the trial court, be affirmed.

CURETON, C. J.

Judgments of the district court and Court of Civil Appeals are both affirmed, as recommended by the Commission of Appeals.