UNITED STATES of America, Plaintiff,

v.

$9,041,598.68 (NINE MILLION FORTY ONE THOUSAND, FIVE HUNDRED NINETY EIGHT DOLLARS AND SIXTY EIGHT CENTS), Defendant.

Civil Action No. H–95–3182.

United States District Court,
S.D. Texas,
Houston Division.

Feb. 13, 1997.

Susan Beth Kempner, U.S. Attys. Office, Houston, TX, for U.S.

J.A. Tony Canales, Canales & Simonson, Corpus Christi, TX, for Mario Ruiz Massieu.

Joel R. White, Ogden, Gibson, White and Broocks, Houston, TX, for Houston Chronicle.

## *MEMORANDUM AND ORDER*

ATLAS, District Judge.

The United States has moved this Court for partial summary judgment on the issue of Claimant Mario Ruiz Massieu's ("Claimant") ownership of the Defendant currency. United States' Motion for Partial Summary Judgment [Doc. # 107]. Claimant has responded in opposition. The Court has considered the motion and responses, the oral arguments of counsel, all other matters of record in this case, and the relevant authorities. For the reasons stated herein, the United States' motion is granted.

## FACTUAL BACKGROUND

Claimant maintains that he has ownership of the Defendant currency because the money was a gift from his parents and brothers, joined with some funds of his own contribution. In his deposition taken months after the funds were seized and this action was commenced, Massieu explained the source of the Defendant currency by relating a conversation he had with his older brother, now deceased, José Francisco Ruiz Massieu:

> When we spoke about the need to send the money to the United States, he told me that he was going to be able to send around $5 million. My brother Arturo could send perhaps a little more than a million dollars, and my parents around $2 million or a little more, and I around 500 or $600,000.

Deposition of Mario Ruiz Massieu (Exhibit A to Opposition to the Government's Motion for Partial Summary Judgment [Doc. # 109]) ("Claimant Deposition"), at 49. The Government argues that the family did not make a gift to Claimant, but rather that Claimant is merely a bailee for his family's money.

Both the Government and Claimant rely upon Claimant's original deposition for their respective positions on Claimant's asserted ownership of the Defendant currency.[1] Claimant urges the Court to consider the deposition as a whole, but then focuses in particular on the following excerpts:

Q: Please tell the Court then why you claim that this money is yours.

A: *Because I have an absolute right to that money. I can dispose of that money.* The rights over that money, I have disposed of that money when I needed it, and *the beneficiary of that account is my wife.*

Claimant Deposition, at 44 (emphasis added).

Q: The question now arises, whose money is it that was deposited in ... [the] Texas Commerce Bank account, whose money is it? That is, is it your brother's? Is it your father's? Is it your other brother Arturo's, or your money, or whose money is it?

A: *Basically fundamentally it's my money.* It's money that is in my name. It's money that independently of who provided it was—it was money that was given to me as my property, which is the way in which a family functions in Mexico, and perhaps this may appear strange here.

In Mexico a family functions through a central axis, and this requires having a moral authority and patrimonial control, which can only be obtained by means of the absolute property of an asset. Seeing this in terms—rather sociopolitical terms, but also looking at it from the viewpoint of the property itself, there is no discussion whatsoever. *And as far as I am concerned, that I am the owner of those resources, that I decide on those resources,* as I decide whether I brush my teeth or not because it's my money, and they are my teeth.

*Id.* at 96–97 (emphasis added).

Q: The question that I have for you, sir, is whether or not you are only a person who's holding this account for the benefit of other people or are you the owner of the property?

A: *I am the absolute owner of the property.*

Q: *Are you holding this property in trust for your brother or any other family members?*

A: *No.* It's an amount of money that belongs to me. It's my property, and it's for my benefit, and I think it's very clear when one sees how the beneficiary is my wife.

*Id.* at 102 (emphasis added).

Q: So to keep money safe, *you are suggesting to the Court that your brother now deceased, and your brother Arturo and perhaps even your father gave this money to you and disavowed themselves of any interest whatsoever?*

---

1. The Government deposed Massieu again on February 4–6, 1997, after and in connection with his production of documents requested in discovery.

A: *Yes.* It is my property. Things work like that in Mexico, and there is a person who is the owner of the money and entitled to it, *and he's got all of the responsibilities,* and he is the owner of all of the money. I don't see any problem.

*Id.* at 121–22 (emphasis added). Claimant also testified in his deposition that, looking at the records of Texas Commerce Bank, his family members are strangers to the account, and that there is nothing in writing to reflect his family's interest in the money. *Id.* at 50. Moreover, Claimant testified that he has used money from the account in question to buy a house in Houston under his own name, *id.* at 102–03, and that during his interview in March 1995 before the United States Pretrial Offices in the District of New Jersey he disclosed that he was the owner of the account. *Id.* at 105.

The Government focuses on other portions of Massieu's original deposition, in which, contrary to his conclusory assertions that he personally "owned" all the funds, he made statements clearly revealing that the money belonged to his family, rather than to him individually. Claimant stated that the money was to remain available to the family and be used as necessary for the family's needs and security:

Q: What reason did your brother give you for you receipt of these eight or nine bags of money?

A: We had spoken about the convenience of taking most of *our family's money* out by virtue of the fact that a gorilla [sic] war had started in Mexico, and a series of economic and political problems was foreseen in the country, and it was considered that it was the safest thing to have it in the United States because Mexico was no longer a safe country.

One cannot open accounts in dollars in Mexico, and the way to retain the value of the money was safer in dollars. *Foreseeing as well, perhaps, the entire family would have to move to the United States due to the political problems in Mexico.*

Q: Did you brother provide you with a reason then that the money should be taken by you from his home in January of 1994, sit in a closet until it was deposited in Texas Commerce Bank on March 3rd, 1994, rather than transported by Jose Francisco into the United States, an account opened and the money deposited?

A: Yes. He was a political figure in Mexico. He had decided that he would go to the highest level in Mexico. *This money would provide security for the family, for our parents, for our brothers, for us* and he did not wish because of his political career to have an account in the United States and deal with these situations that had to do with the family, so that he could devote his time totally to politics.

Claimant Deposition, at 4243 (emphasis added). Claimant further testified that, when the account in question was opened, he and José Francisco had

a conversation regarding the need to transfer a substantial amount of money to anticipate problems that were on the one hand economic and political, *which would allow, if it became necessary, to move the entire family to live in the United States.*

*Id.* at 94 (emphasis added). Moreover, when explaining that his brothers and parents were each contributing to the money to be sent to the United States, Claimant was asked whether "*[t]hey* believed that this was a safe way to ensure that *their money would be available and safe,*" and he answered "Correct." *Id.* at 49–50 (emphasis added).

Claimant also testified that his older brother, José Francisco, previously "had the role of the moral authority within the family" and "was like the patriarch of an entire family," *id.* at 89–90, and that José Francisco had passed the patriarchal authority to him. When asked about money in question, Claimant answered in terms of his new role as patriarch:

Q: So at this point in time then, what decision was made *by you and your family,* including Jose Francisco, *regarding your family's assets* in Mexico?

A:  The decision was that he would forego that moral authority or patriarchal position that he held within the family, and he would involve himself fully in the political problem that he was living, and *this role that he had played within the family would then become mine,* because of my profession as an attorney, as a lawyer, and the role which I played when he was absent with my parents, with my sister and my younger brother.

*Id.* at 95–96.

Both parties cite the Court only to the deposition as factual support for their positions on the issue of ownership. Claimant has not provided any affidavits, from himself or his family members, providing detail as to the circumstances of each gift. Rather, the Court is cited only to Claimant's general statements in his deposition as to the funds as a whole.

### *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Bozé v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *Bozé,* 912 F.2d at 804 (citing *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986)). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (5th Cir.1995).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. For any matter on which the nonmovant carries the burden of proof at trial, however, the movant may, by merely pointing to the absence of evidence supporting the essential elements of the nonmovant's case, shift to the nonmovant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact so as to warrant a trial. *Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155, 161 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996) (citing *Engstrom v. First Nat'l Bank,* 47 F.3d 1459, 1462 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 75, 133 L.Ed.2d 35 (1995)); *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Douglass v. United Servs. Auto. Ass'n,* 65 F.3d 452, 459 (5th Cir.1995), *revised on other grounds,* 79 F.3d 1415 (5th Cir.1996) (en banc); *Little,* 37 F.3d at 1075. In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands,* 66 F.3d at 92; *Little,* 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552).

### *DISCUSSION*

The issue of ownership of the Defendant currency turns on whether the currency was a gift to Claimant, or was merely entrusted to him by his family so as to create a bailment or resulting trust. Since Claimant asserts that he has ownership of Defendant

currency because it was a gift from his family members, the Court must determine whether Claimant has demonstrated a genuine issue of material fact as to the legal elements of a gift.

As the above deposition excerpts demonstrate, Claimant's testimony on the issue of ownership is self-contradictory, at times claiming absolute ownership and control, and at other points claiming that his family has entrusted him with the money so that it will be safe and available to them if necessary. Claimant has argued in previous proceedings that these positions are reconcilable in that he is the absolute legal owner of the currency, but has a "moral" obligation, arising allegedly from Mexican custom,[2] to use the money to care for his family.

■ Even if Claimant sincerely believes that the Defendant currency was given to him by his family members as a "gift," and even if the transfer of the currency could somehow be considered a "gift" by lay terms, this Court is bound to apply the legal definition of "gift" under Texas law. When Claimant's testimony is examined closely with reference to the elements of this legal definition—particularly the element of the donors' intent—it is clear that, as a matter of law, Claimant has not demonstrated a genuine question of material fact that can defeat summary judgment.

2. The Court notes that Claimant has offered no evidence supporting his statements as to Mexican custom.

3. See United States v. $38,570 U.S. Currency, 950 F.2d 1108, 1112 n. 4 (5th Cir.1992) (citing S.Rep. No. 225, 98th Cong., 2d Sess. 215 (1984), reprinted in 1978 U.S.Code Cong. & Admin. News, 9496, 9522); United States v. $321,470.00, United States Currency, 874 F.2d 298, 303 (5th Cir. 1989); United States v. One Parcel of Real Property, 831 F.2d 566, 567 (5th Cir.1987); United States v. One 18th Century Colombian Monstrance, 797 F.2d 1370, 1376 (5th Cir.1986), cert. denied, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987).

4. In One 1973 Rolls Royce, 43 F.3d at 806 n. 8, the Third Circuit noted that "the standing inquiry suggests that the question of determining ownership may in fact ultimately be governed by federal common law," but concluded that "[n]evertheless, it is well established that federal com-

## Legal Elements of a Gift under Texas Law

The parties have cited the Court to Texas law on the issue of whether or not the transfer of Defendant currency to Claimant satisfies the legal definition of "gift." The Court agrees that it is appropriate to apply Texas law to this question. Although the legislative history directs that the term "owner" in 21 U.S.C. § 881(a)(6) is to be broadly interpreted so as to encompass "any person with a recognizable legal or equitable interest in the property seized,"[3] the courts look to state law to define particular ownership interests. United States v. One 1973 Rolls Royce, V.I.N. SRH–16266, 43 F.3d 794, 805 n. 8 (3d Cir.1994); United States v.1977 Porsche Carrera 911, 946 F.2d 30, 34 (5th Cir.1991); United States v. Lot 9, Block 2 of Donnybrook Place, 919 F.2d 994, 1000 (5th Cir. 1990).[4]

■ Three elements are necessary to establish the existence of a gift under Texas law: (1) intent to make a gift; (2) delivery of the property; and (3) acceptance of the property. Hinton v. Federal Nat'l Mortgage Ass'n, 945 F.Supp. 1052, 1058 (S.D.Tex.1996); Dorman v. Arnold, 932 S.W.2d 225, 227 (Tex. App.—Texarkana 1996, n.w.h.); In re Estate of Hamill, 866 S.W.2d 339, 344 (Tex.App.—Amarillo 1993, no writ). The person claiming that a gift was made has the burden to prove

mon law may incorporate state law as the rule of decision." The court remarked that federal standing doctrines, such as the "nominal ownership" rule, seem to provide a "back-door method" of defining ownership interests and to apply a "federal common law gloss to the proposition that state law controls the question of ownership." However, the Court further stated that "it is not clear to us why there is any need for such a federal common law gloss since state law appears to makes [sic] adequate provision for depriving 'nominal' or 'straw' owners of full 'ownership'" through doctrines such as fraudulent transactions, alter-ego, or veil piercing. Id.

See United States v. $47,875.00 in U.S. Currency, 746 F.2d 291, 293–94 (5th Cir.1984) (when claimants who challenged a forfeiture of currency under Section 881(a)(6) argued that they had a legal or equitable interest in the currency by virtue of a joint venture relationship, court examined the elements of joint ventures under Texas law and held that, as a matter of law, no joint venture existed).

the gift by clear and convincing evidence. *Dorman*, 932 S.W.2d at 227; *Oadra v. Stegall*, 871 S.W.2d 882, 891–92 (Tex.App.—Houston [14th Dist.] 1994, no writ).

■■■ The "principal issue" in determining whether a gift has been made is the intent of the donor. *Dorman*, 932 S.W.2d at 227; *Hamill*, 866 S.W.2d at 344. The donor "must, *at the time he makes the alleged gift*, intend *immediate* divestiture of rights of ownership out of himself and the consequent and immediate vesting of such rights in the donee." *Oadra*, 871 S.W.2d at 890 (citing *Thompson v. Dart*, 746 S.W.2d 821, 825 (Tex. App.—San Antonio 1988, no writ)). *See Dorman*, 932 S.W.2d at 229 (donor's intent at the time of the transfer is relevant; there must be a "valid present gift") (citing, *inter alia*, *Harmon v. Schmitz*, 39 S.W.2d 587 (Tex. Comm.App.1931, judgment adopted)); *Akin v. Akin*, 649 S.W.2d 700, 704 (Tex.App.—Ft. Worth 1983, writ ref'd n.r.e.) ("[a]n inter vivos gift can have no reference to the future, but must go into immediate and absolute effect").

■ Texas courts have emphasized that in order for there to be a valid *inter vivos* gift, the transfer of property must be made "voluntarily and gratuitously." *Pankhurst v. Weitinger & Tucker*, 850 S.W.2d 726, 730 (Tex.App.—Corpus Christi 1993, writ denied) (citing *Hilley v. Hilley*, 161 Tex. 569, 342 S.W.2d 565, 568 (Tex.1961)); *Akin*, 649 S.W.2d at 702; *see also* Texas Pattern Jury Charge 202.03. "It has long been the rule in Texas that for a gift to be effective, title to

the item 'must pass immediately and *unconditionally* and the transfer thereof must be so complete that the donee might maintain an action for the conversion of the property.'" *Oadra*, 871 S.W.2d at 890 (quoting *Fleck v. Baldwin*, 141 Tex. 340, 172 S.W.2d 975, 978 (Tex.1943)) (emphasis added).

> All dominion and control over the property must be released by the owner. Until a donor has divested himself, absolutely and irrevocably of the title, dominion and control of the subject of the gift, he has the power to revoke it. If the donor has the *power to revoke*, there is *no valid gift*.

*Id.* (citations omitted) (emphasis added).

### Application of Gift Definition to the Transfer in Question

■ Under Texas law as set forth above, it is therefore the intention and understanding of each of the *donors*—i.e., Arturo, José Francisco, and Claimant's parents—at the time of their transfers of money, rather than the opinion of Claimant himself, that is dispositive on the issue of whether or not the Defendant currency was a gift to Claimant. Claimant has provided no evidence, nor has he even asserted, that the donors of the money intended that he would have complete dominion and control of the Defendant currency for his own exclusive use[5] Nor does his testimony establish that the donors transferred the money to him unconditionally, that is without regard to the donors' and their respective families' welfare. In fact, Claimant's own testimony, the only evidence of record,[6] establishes repeatedly and in some

---

5. The fact that Claimant has spent part of the Defendant currency on a house for himself in no way contradicts a theory that he is the bailee for the family since he himself is a member of the family for whose benefit the money is held. Moreover, Claimant and the Government agree that to the extent Claimant contributed his own legitimately earned money to the seized funds, Claimant has a right to these monies as the legal owner. Claimant testified that he contributed approximately $500,000 to $600,000 of the money. Claimant Deposition, at 49. Thus, his purchase of a new house for less than this sum is consistent with the rest of the corpus being held for the benefit of others.

6. Despite the pendency of this case and three rounds of litigation as to Claimant's relationship to the funds, Claimant has not presented affida-

vits or deposition testimony from any of the donors or their respective immediate family members as to the intent of any of the donors at the time they allegedly transferred their funds to Claimant. This absence of proof does not appear to be attributable to Claimant's current legal difficulties as the subject of deportation proceedings or his maintenance under "house arrest." Claimant's counsel at numerous pretrial hearings in this case has referred to Claimant's attorneys in Mexico, New York and Texas, to whom Massieu has unlimited access in person and by telephone. There is no reason in the record as to why additional proof was unavailable during the year long pendency of this action. Furthermore, at the most recent discovery hearing, Claimant's counsel revealed that various family members might testify at trial of this case.

detail that the donors intended for Claimant to care for the donors' respective family members with the money after it was moved to the United States.

In this case, Claimant's testimony that pertains to his family's intent demonstrates that, contrary to Claimant's position, his family members wanted the family money to be safe in the United States and to be available for their benefit in case they needed it.[7] Indeed, when posed with a question that related only to the family's decision about its assets, Claimant responded in terms of his new patriarchal role in the family, *see supra* at 637 (quoting Claimant Deposition, at 95–96), thereby strongly suggesting that his possession of the Defendant currency and his role as patriarch are inseparable. Claimant has directed the Court to no testimony or other evidence suggesting that *his family,* the donors, intended that he have absolute ownership of all the money[8] Nor has he provided any affidavits or other evidence from his parents, his brother Arturo, survivors of José Francisco, or any other family members as to the donors' intentions when the money was allegedly transferred from them to Claimant.[9]

The only indicia of ownership in the record are post-transfer acts by Claimant that merely demonstrate his own intentions for the money. The evidence upon which Claim-

ant relies—*i.e.,* he is the "owner" because he caused the funds to be brought to the United States, he created the bank account, he is sole signatory for the bank account, he named his wife as beneficiary of the account, and he withdrew some of the funds to buy a house in Houston in his own name—relates to actions taken by Claimant unilaterally. This evidence sheds no light on his family's—the donors'—intentions. In addition, of course, the evidence is irrelevant to the intentions his family had for the money *at the time they transferred* it to Claimant. *See Oadra,* 871 S.W.2d at 890 (courts must look to the donors' intent *at the time* the transfer was made, and not at some later point). To the contrary, Claimant's own testimony concerning his conversations with his family members at the time of their transfers of money to him is inconsistent with the theory that these family members intended to give him an outright gift of more than $5 million, $2 million and $1 million respectively, but rather supports the Government's theory of bailment.

Finally, the Court notes that the fact that a purported donee has control over a bank account containing funds alleged to be a gift, even if such control is taken with the alleged donors' agreement, is not sufficient in itself to establish a gift. *See Dorman,* 932 S.W.2d 225.[10] In *Dorman,* a sister of a

---

7. *See, e.g.,* Claimant Deposition, at 42–43 ("We had spoken about the convenience of taking most of *our family's money* out [of Mexico].... Foreseeing as well, perhaps, the entire family would have to move to the United States due to the political problems in Mexico.... This money would provide security for the family, for our parents, for our brothers, for us") (emphasis added); *id.* at 94 (money transferred to United States "would allow, if it became necessary, to move the entire family to live in the United States) (emphasis added); *id* at 49–50 (Claimant answered affirmatively when asked whether his family members "believed that this was a safe way to ensure that their money would be available and safe") (emphasis added).

8. The only possible exception to this is Claimant's affirmative answer to a leading question, indeed a statement, as to whether his family members "gave this money to [him] and disavowed themselves of any interest whatsoever." Claimant's Deposition, at 121–22. After responding "Yes" to the question, Claimant elaborated by stating "[t]hings work like that in Mexi-

co, and there is a person who is the owner of the money and entitled to it, and *he's got all of the responsibilities,* and he is the owner of all of the money." *Id.* at 122. These statements in elaboration support a theory of bailment rather than outright gift. Claimant's deposition statements simply do not support his argument that he received unconditional control over the funds to spend on himself to the exclusion of the donors or their immediate families.

9. To the extent that Claimant unilaterally deems his responsibility to the donors and their family members to be only a "moral" obligation, this is not dispositive on the issue of intent. Indeed, this opinion is merely Claimant's self-serving explanation of his own current obligations, and Claimant has not even alleged that it establishes the donors' views.

10. Other cases in addition to *Dorman* hold that ownership on paper of a bank account by the purported donee does not necessarily demonstrate that donor intended the account's funds to

deceased man, Ridgeway, argued that Ridgeway had made a gift of the accounts to her. Ridgeway's daughters argued that there had been no such gift even though, at Ridgeway's request, the sister had removed Ridgeway's name from his savings and CD accounts and had replaced it with her own name, and had paid Ridgeway's medical and funeral expenses out of these accounts. The Court focused on the sister's testimony, as follows:

A: [Ridgeway] said his health was getting worse and that I had been real good to him and I had taken real good care of him and he wanted me to have his money if something happened to him. . . .

. . . .

Q: And if there was any left when he passed away it was to go to you?

A: Right.

*Dorman*, 932 S.W.2d at 228 (emphasis deleted). The Court held that the record established that Ridgeway intended for the property to remain his until his death and that, since he had retained ownership and had only a *testamentary* intent, present donative intent had not been shown. *Id.*

Although Claimant makes assertions in his testimony that the money was a gift, such asserted legal conclusions do not suffice to defeat summary judgment when not accompanied by affidavits from the donors or any other supporting evidence going to the donors' intent. Claimant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, or a scintilla of evidence and, in the absence of any proof, this Court will not assume that Claimant could or would prove the necessary facts going to the donors' intent. *See Douglass*, 65 F.3d at 459; *Little*, 37 F.3d at 1075. The Court therefore concludes that Claimant has not demonstrated a genuine issue of material fact concerning the donors' intent.

### Presumption of Gift to "Natural Object of Bounty"

Claimant attempts to satisfy the intent element of the gift definition by availing himself of a presumption in favor of gift when a transfer is made to the natural object of one's bounty. In particular, he points the Court to several Texas cases following the Restatement of the Law of Trust (Second) § 442, which reads as follows:

Where a transfer of property is made by one person and the purchase price is paid by another and the transferee is a wife, child, or other natural object of bounty of the person by whom the purchase price is paid, a resulting trust does not arise unless the latter manifests an intention that the transferee should not have the beneficial interest in the property.

*See Amador v. Berrospe*, 1996 WL 711276, *2, —— S.W.2d ——, —— (Tex.App.—Houston [1st Dist.], n.w.h.); *Kyles v. Kyles*, 832 S.W.2d 194, 197 (Tex.App.—Beaumont 1992, no writ); *Equitable Trust Co. v. Roland*, 721 S.W.2d 530, 533 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). The presumption in favor of a gift made to the natural object of one's bounty may be rebutted by clear and convincing evidence. *Amador*, 1996 WL 711276, at *3, —— S.W.2d at ——.

This presumption is not properly applied to Claimant in this case. The latter part of the Restatement, as quoted above, creates an exception to the presumption for instances in which the donor "manifests an intention that the transferee should not have the beneficial interest in the property." This exception applies in this case since, as stated above, Claimant's own testimony demonstrates that his family members intended that the currency would remain available to them in case they needed it.[11]

---

be a gift. *Akin*, 649 S.W.2d 700; *Harmon*, 39 S.W.2d 587.

11. In addition, under the circumstances presented, it is not at all clear that Claimant is properly a "natural object" of the bounty of his two brothers. Claimant, a middle-aged, well-established man, was a professional who has not been shown to have been in need of financial assistance. While it appears that siblings may, in some instances, be considered a "natural object of the bounty," the Restatement notes cited by Claimant state that the presumption is applicable "particularly" when the donor has no issue at the time of the transfer. *See* Opposition to the Government's Motion for Partial Summary Judgment, at 12. However, José Francisco had his own wife and children upon whom he might have bestowed the money.

**642**

### *CONCLUSION*

Since Claimant has not presented any evidence establishing the donors' intent to make the Defendant currency a gift to Claimant, partial summary judgment is appropriate. The Court holds that the transfer of Defendant currency to Claimant from his family members was not a gift under Texas law, and therefore Claimant may not claim ownership of the Defendant currency by virtue of receipt of a gift. The parties have not addressed whether or not Claimant may, under federal forfeiture law, base his claim upon another legal relationship to the Defendant currency, and the Court does not reach that issue.

For the reasons stated herein, the United States' **Motion for Partial Summary Judgment** [Doc. # 107] is **GRANTED**.